Case number 19-1023 et al. Growth Energy Petitioner versus Environmental Protection Agency and Andrew Wheeler Administrator. Thank you. Welcome to all council this morning and we'll begin with the claims by the Renewable Fuels producers. Mr. Lane when you're ready please proceed. May it please the Congress prescribed increasing national renewable fuel volume requirements to as this court has put it force the market to use greater and greater volumes of renewable fuel each year and each year EPA is obligated to set national percentage standards that are reasonably calculated to force obligated parties to use the required amount of renewable fuel. This duty stems from Congress's command that EPA set percentage standards that ensure that the volume requirements are met and the duty to engage in reasoned decision-making which includes considering all important aspects of the problem and rationally basing the decision on the evidence before it. In certain circumstances EPA may determine that the percentage obligation shall not apply to individual small refineries. When it grants such exemptions without adjusting the national standards to AFPM a renewable fuel shortfall. Can I ask a question at the outset Mr. Lane and then before getting into the substance of the issue just about timeliness about the timeliness of the challenge. So in the 2011 rule the agency said that if any small refinery exemptions for 2011 are approved after this final rule making the parties would be exempt but we would not intend to modify the 2011 and it goes the agency went on to say periodic revisions to the standards to reflect waivers issued to small refineries and refiners would be inconsistent with the statutory text and would introduce an undesirable level of uncertainty for obligated parties. And so since the agency spoke in terms of a contrary approach being inconsistent with the statutory text and just put to one side for a moment that starting in 2020 a different approach was adopted but in terms of the lay of the land as of 2011 and in the intervening years including 2019 the agency had said that a different approach quote would be inconsistent with the statutory text close quote and so the question obviously arises well did a challenge of the kind that you are now asserting need to be brought within 60 days of the rendering of that interpretation in 2011. The answer is no and there are a lot of reasons for this. I would start with the fact that what EPA said was inconsistent with the statute is not at all what we're asking for. What it said was inconsistent was modifying the standards after they've been set in the course of the compliance year and we're not requesting that and we're not saying that EPA should do that. EPA also interpreted its regulation at that time to permit it to account only for the regulation or the standards but the regulation didn't require that. That was just an interpretation that EPA adopted in the course of that standard setting and then subsequent ones but the regulation can easily be interpreted to permit what we are proposing. Why does that matter from a point of view of timeliness? That is EPA has a regulation it's interpreted a certain way. Interpretation is regulation for purposes of timeliness. You can challenge it at that point but you can't challenge it later. It wasn't only in 2011. In 2018 the agency said EPA is maintaining its approach that any exemptions for 2018 that are granted after the final rule is released will not be reflected in the percentage standards. So that's indirectly what you are asking that any exemptions be reflected and I don't understand the timeliness question. The fact that it's an interpretation of a regulations can be changed but you have to challenge the agencies told you what they thought the regulation meant and that's the time to challenge it. Well there are additional reasons why I don't think it's time borrowed. For one thing there were other ways EPA could have done what we were asking without touching its interpretation of the regulation. It could have used a larger cellulosic waiver flow-through because it has discretion to determine how much of the cellulosic waiver to apply to the advanced and total requirements. Could have increased the standards by adding by the amount of prior exemptions which is something it never spoke to but something that is effectively done in the past to deal with other shortcomings. And perhaps most importantly an additional reason I would direct the court to its own decisions in the AFPM case and the Elan case where in both cases there were challenges to old EPA regulations. Which was the first one you mean marketing assistance? Is that what you mean? Is that the case? Pardon me the American petrochemical and fuel manufacturers or I think I have fuel and petrochemical reversed. They're one of the parties in this case. This decision involved the 2018 renewable fuel standard and then the Elan refining case involved the 2017 renewable fuel standard. But the Elan case turned specifically on the statutory language. That's what that's what we said in Elan. Well it did but so does ours. I think the lesson from both of those decisions. We don't have statutory language that says as appropriate. Well we have statutory language that says that each year when EPA sets the standards it must set them to ensure that the volume requirements are met and EPA must engage in reasoned decision making each time it does that. Those are independent obligations that apply every time it acts. And what AFPM and Elan recognized is that if you're arguing that EPA failed in those duties that even if that challenge implicates the validity of some old policy or regulation that you can't challenge directly, the challenge to the standards is still timely. And I would if I may I would read a key passage from AFPM in which the court said after holding after concluding that the challenge was time barred. Where are you in the opinion? Page 587. There was a challenge to EPA's RIN policy for exported renewable fuel and the court found that was time barred because the policy was adopted many years earlier. But then the court said the challengers quote have not explained how a change in the policy would have required the agency also to change its proposed applicable volumes and percentage standards. Therefore EPA could without acting arbitrarily and capriciously take the discreet action of establishing the volumes and standards while declining to reconsider the policy. And in Elan at 653 to 54 after the court held that certain challenges to the held that a very similar challenge was not time barred because the challenge was that EPA had to reassess the point of obligation each year under the statute. What we're saying is that the standard EPA set for 2019 were invalid on their own because they do not satisfy the duty to ensure and the duty to engage in reasoned decision-making both of which apply every time EPA sets the define a legal obligation outside the scope of the rulemaking were disregarded just because it addressed it in an interpretation some years earlier. Okay can I ask the question this way so it seems like there's two possible bases for an argument that the challenge is untimely. One is to say that back in 2011 and here I'm focused on 2011 not on things the agency said subsequently that in 2011 the agency rendered an interpretation of the statute and once it renders interpretation of the statute that has to be challenged within 60 days and then any any challenge to that interpretation of the statute is time barred after 60 days. Another way to look at it is to say well no the real issue is the interpretation of the regulation and with respect to the interpretation of the regulation it rendered an interpretation at one point and then it kept reiterating that same interpretation of the regulation. What there was to put aside the statutory one and just think about the regulatory one  reinterpretation if EPA says every year we're maintaining our approach then the does that in your view intersect with your claim such that the interpretation is frozen in time going forward or is what the agency is saying we're interpreting the regulation in the sense that we're going to apply it this way for this year but that doesn't necessarily mean we're going to apply it the same way in a subsequent year either we just have to revisit it each year. The latter this is I think an independent basis to conclude that it's not time barred independent from the things I just said because EPA was not adopting an official binding interpretation of the regulation it was just saying right now we're going to do what we did last year and it kept saying that we're gonna do what we did last year it's they did it in the 2019 rulemaking as well so I think that this was on the table every year it was not binding it certainly isn't entitled to any deference I don't even think it's consistent with the with the plain language of the regulation but we think that our challenge is fully timely for a variety of these reasons the regulation interpretation wasn't official and binding there are other ways to deal with it without altering the interpretation and in any event there is a current duty to ensure and to engage in reasoned decision-making which is a timely claim under AFPM and Elan. When you say there's no deference the Elan approach was a review of the refusal to reconsider which the court certainly indicated was even more deferential than a normal review of agency rule isn't that right? That was the part of the case that was held well there were a number of different but related challenges and so the court held that a challenge to the original 2010 point of obligation rule was time barred a challenge to a the denial of a petition to reconsider was not time barred it's not what I'm talking about it's the it's a third thing it's the go ahead well the third thing as I understand it is a challenge to the validity of the percentage standards that were set for 2017 because those standards did not include a reassessment of the point of obligation that that claim was not time barred. No but the the the holding of the case is EPA's determination as to whether it is appropriate to reconsider the point of obligation in the context of an annual volumetric rulemaking is reviewable for abuse of discretion. Okay. Okay well that's deferential abuse of discretion when you say without deference I'm not sure what you mean by that. Oh I'm just saying that if you want to understand whether the regulation precludes the relief the adjustment that we're seeking even though EPA adopted an interpretation that said it did preclude it we don't think that that interpretation was correct and that interpretation is incorrect the plain language of the regulation permitted exactly what we have requested EPA subsequently amended the regulation to permit what we're requesting we don't think it was necessary because the regulation always permitted that it just wasn't doing it just EPA was not doing that. So wait I'm just a little bit confused about that so if if the argument is that the interpretation of the regulation was incorrect then it seems like the perfect time to challenge the interpretation of the regulation is incorrect is that them is around the time that the interpretation was rendered. Why does the fact that you think it's incorrect mean that that in and of itself means there's no timeliness issue? I apologize I wasn't trying to see Joe okay that's an answer for the time bar I just want to be clear that we don't think that that regulation precluded the relief that we were asking EPA to provide it could have done that even in the context of the percentage standard setting. Okay I see thanks. I see my time has expired if I may just make one quick additional point or I'm happy to answer. You can take a minute to make an additional point and then we'll move. Thank you well it's a point about the remedy in this case. I just wanted to clear that should the court agree with us that EPA did need to adjust the standards to account for the exemptions that it's imperative that the court direct EPA to actually do that on remand. In the Americans for Clean Energy case the court held that the standard EPA had invalidly waived the requirement by 500 million gallons. Three years later EPA has still done nothing to remedy that and it is claimed that it would be a retroactive obligation to do so. That's incorrect under this court's decision in Monroe Energy and MCRA but I think it's the same situation here where EPA has set a lower than permitted standard. We're always going to have this problem on remand that there's going to be a makeup in the future. That has to be permissible otherwise judicial review will be meaningless. So I think it's imperative that the court provide some guidance and directions EPA to actually remedy the the invalidly low percentage standards. So how would you frame that because your briefs only ask for remand if the court agrees with you. Remand for further proceedings. Yes I would I would be clear that that EPA actually needs to requirements. There are certainly some mechanical details to work out about how to do that and I'm certainly not asking the court to wade into those technical issues but just to make clear that EPA can't do nothing which is its position with respect to Americans for Clean Energy but it can do literally nothing to remedy a violation held by this court. Well I wondered whether your remedy then has some sort of time frame in mind. It would be nice to do it by the time of the next annual standard setting ideally and and I don't think that would be particularly difficult it's just a mathematical computation to work out. Thank you. Thank you. Okay thank you Mr. Lean. We'll give you some time for Good morning and may it please the court. My name is Doug Hastings. I'm appearing on behalf of Producers United. Producers United joins the argument Mr. Lange presented the EPA must account for retroactive small refinery exemptions. If the court agrees it need not reach Producers United's separate issue but if it disagrees there is still another problem with the way the EPA treated small refinery exemptions here and that is the EPA's decision to grant 2019 exemptions retroactively in the first place is arbitrary and inconsistent with the RFS. Retroactive exemptions granted during or after the compliance year have no place in the RFS which sets out prospective annual mandates designed to promote increased renewable fuel use. Retroactive exemptions upend that system by eliminating refiners obligations after the annual percentages are set and even if there are some ambiguity and abstract about whether EPA could issue retroactive exemptions it is surely unlawful here and that is because EPA decided in the 2019 rule to continue granting retroactive exemptions when it knew that would not account for them and that those exemptions would therefore substantially reduce the required volumes that EPA set. That decision violates EPA's duty to ensure that the statutory volumes are met. EPA's only response essentially to those points are that the challenge is not before the this is wrong for three reasons. Some of them overlap with some of the procedural issues we just discussed but I think it's important to emphasize that EPA's decisions about granting retroactive exemptions are made only in the context of particular annual rules. The court has already mentioned that in 2011 EPA made some determinations about this for the first time but these are particular methodologies that are applicable to that year's annual standards. As recently as 2018 EPA made clear in the AFPM case that it applies its methodology in these annual standards only to that particular year. It actually argued that its methodology for another issue was only applicable that year and shouldn't be used as a precedent going forward. Secondly this is something that I'm sorry I hate to be harping on timeliness for everybody but jurisdictional question for us so it has to be answered. So no retroactive exemption you're not challenging any particular exemption having been granted and in in the previous Producers United case we emphasized that you were not challenging any specific exemptions and instead you were challenging the rule and the statements in the subsequent annual rulemakings and that that was not timely. Correct. I think your honor there's a distinction in that previous case this was a grounds arising after challenge and this had not been presented. The grounds arising after was an effort to I think what the court said was sidestep maybe that was an AFPM case where they used that word that is to extend the time because there were grounds arising after but the the nature of I'm not interested in the question of whether there's collateral estoppel here I'm and the court said that by not asking for an exemption challenging a specific exemption and because there was no nothing arising after within the time you were out of time. So I don't I'm still not following why that case doesn't tell us that your challenge here is untimely. So I think there are two additional answers one is that this is something that EPA reopens each year when it assesses essentially in this in the context here. Reopening but you know our we are really really stingy about reopenings and the agency is pretty clear they're not reopening anything. So your honor I think you can look at it both ways I think primarily this is something that EPA raised in the context of the 2019 rule and its determination that it needed to make again in the 2019 rule to determine how it set annual percentage standards. I think only if you view this the original determination in 2010 and then again in 2011 as something that set APA's position in stone then I think you can consider this as a reopening and part of the reason is going back to EPA's change and its treatment of small refinery exemptions that only became apparent in the middle of 2018. It's dramatically expanded the program in a way that's that's the after arising argument that you made and that's the one that was rejected as still having waited until after till too long after the after arising evidence occurred. Correct your honor I think that is that is true with respect to the grounds arising after argument where the comment has not been presented and under the Clean Air Act you have to have a specific grounds arising after ground if you have not commented on the rulemaking in order to have preserved that comment and that's sort of a preservation issue. But simply with respect to the broader issue of whether this is presented this year Producers United has made ample comments other parties have made the comments so that aspect was before the agency. I think there's a separate question as to whether this is something that the agency has put forth in its 2019 rule. I think it expressly discussed it when it said and I quote any exemptions for 2019 that are granted after the final rule is released will not be reflected in the annual percentage standards. That's something where it is exhibiting a decision to examine its approach and maintain that approach so the agency is making that determination and putting it back at issue and I think it's something that it needed to wrestle with in light of its duty to ensure the annual standards are met and particularly in the light of the increasing number of gallons that are exempted from the Renewable Fuel Standard Program as a result of the dramatically expanded system of small refinery exemptions. Thank you I'll make sure my colleagues don't have further questions for you Mr. Hastings and I'll hear from you on the renewable electricity issue. Good morning may it please the court David Williamson for the petitioner RFS Power Coalition on the electricity fuel issue. In a way this issue has already been decided by this court's 2013 decision in American Petroleum Institute which looked at application of the same provision section 7d of the EPA. We are producers of cellulosic electricity fuel. If you drive a Tesla or ride on an electric bus it might be powered by our renewable fuel. For 2019 Congress mandated 8.5 billion gallons of cellulosic fuel but invoking subsection 7d EPA reduced Congress's goal by over 95%. Section 7d directs EPA to calculate quote biofuel production but EPA failed to count any electricity fuel actually being produced by our members in real time and being used as transportation fuel. The government now argues that EPA counts RIN credits not biofuel production but the statute section 7d speaks to biofuel production not RINs. This is the converse of the American Petroleum Institute case where the agency over counted fuel production for policy reasons but EPA is making the same mistake by focusing on RIN credits rather than fuel production and other technical and regulatory issues that are mentioned in the record. EPA is injecting policy considerations into what this court has described previously as a data driven calculation. EPA must hew to the text and using policy to tilt this annual calculation is prohibited by API and of course rewriting the statute to substitute RIN credits for fuel production is prohibited by the Americans for Clean Energy decision and other precedent. The result here I want to emphasize is devastation for electricity producers. Shuttered plants, ink slips, and financial losses for investors that relied on EPA's qualification of electricity six years ago in 2014. So we asked the court to vacate EPA's use of the 7d reduction and remand for a proper calculation of biofuel production which is what the statute requires. I'd be I do want to make one last point. We feel compelled to address the government's suggestion in its brief that applying the statute literally would result in quote havoc and that's at EPA's brief at page 80. The concept or the notion that there's a burden on any parties is not in the record. It's only in the government's brief and that's for good reason because there is no scenario in which obligated parties would lack access to RIN credits if EPA actually counts biofuel production under 7d and that is because another section of 7d, Romanet 3, which follows the provision that we're discussing creates a reserve of cellulosic waiver credits. Also on remand, EPA can add any undercounting balance to the 2021 or future annual compliance years rather than reopening the 2019 annual volume which of course now is is well past us. So unless the court has any questions I will yield the floor. Thank you Mr. Williamson. Mr. Hoshijima, we'll hear from you for the government. Good morning. May it please the court. Suki Hoshijima from the United States Department of Justice on behalf of the Environmental Protection Agency. Appearing with me are my colleagues Ben Carlisle and Mike Eidel. I'll begin today with the claim that EPA failed to adequately account for small refinery exemptions. The court lacks jurisdiction to hear this claim. As this court noted, EPA has taken the same approach since 2011 to calculate the percent of standards. Petitioners challenge to this interpretation and this approach is untimely because of the Clean Air Act 60-day jurisdictional deadline. Petitioners cannot sidestep that jurisdictional deadline by reframing their challenge as a challenge to the 2019 annual rule because this court has held that the application of a long-standing regulation to new facts does not reopen the time frame for judicial review. Can I just ask you to clarify that the the source of your untimeliness argument, what is the interpretation that had to be challenged within 60 days? What's the document that the agency rendered that you're pointing to? In the 2011 annual rule, EPA interpreted its formula for calculating the percentage standards as accounting for small refinery exemptions that are granted before the date of the standard but not those afterward. And EPA has consistently taken that approach in every year since. But is it the fact that in 2011 there's a statement about what would be or is it something in 2011 and in subsequent years that interpreted the regulation? I think both the fact that in 2011 EPA said that it was interpreting the formula to account for certain exemptions and not for others and as well as the statement that no alternative approach would be inconsistent with the statute. But they seem like different arguments because one of them is about our interpretation that says that if we do anything different it would not cohere with the statute. And that's an interpretation of the statute of what the agency is compelled to do by dint of the statute. But a different argument would be, and if I'm wrong about this conceptually just tell me, but as I understand it there's two different arguments you could be making. One is to say in 2011 we said in our rule that if we do it in a different way it would be inconsistent with the statute. And so we had no freedom to do anything different unless we changed our interpretation on that And once we rendered that interpretation of the statute the challenge had to be brought to that interpretation within 60 days. But another way to do it is to say no really the instrument that renders this untimely is that we were interpreting the regulation. And the regulation we thought required us to do it this way to not take account of these retroactive exemptions. We said that in 2011. We said it again in subsequent years. And all we were doing in subsequent years was just reiterating it. But that's our interpretation of the regulation. And once we rendered that interpretation of regulation that had to be challenged within 60 days of that interpretation. Which, which one of those two arguments are you making? I think more of the latter your honor. In 2011 EPA interprets the formula in the regulations to account for adjustments, account for certain exemptions and not for others. And EPA has taken that interpretation of the regulation ever since. So if EPA rendered an interpretation of the regulation and it said not that we way that it compels us to do the following. If EPA says here's how we're going to implement the regulation this year. We're going to implement it by not taking account of retroactive exemptions. Well then it seems like in subsequent years they're free to interpret in a different way. It's just that every time they apply the regulation they're choosing how to apply it. They're not rendering an interpretation that says this is the only way we read these words to work. Do you, do you see that distinction? And if there is that distinction then do you think that in prior interpretations that the agency was actually saying this is the only way the words of this regulation can be read? I'm not sure that in 2011 EPA was saying that's the only way the regulation could be read. But EPA I think even if there are multiple permissible interpretations of the regulation is entitled to adopt an interpretation in 2011 and then thereafter refer back to that rather than reconsidering that interpretation. They definitely can do that of course but then the question is whether it's ever untimely. So suppose EPA in 2011 says you know this regulation doesn't actually by its terms give us an answer on what we do with retroactive exemptions. It doesn't compel us to take them into account. It doesn't preclude us from taking them into account. Here's what we're going to do this year. We're going to, we're not going to take them into account. And then the following year they say we're going to continue not taking them into account. Well then on that it doesn't seem to me that there's any untimeliness problem if in the third year they say we're not going to take them into account this year either. Someone could come in within 60 days of that and say well okay this year you'd continue to prior practice but it's something that you could have done or you couldn't have done. You decided to do it. We're challenging that you did it this year and every year it starts anew because you've already said we could have done it either way and for this year we're doing it in the following way. I think there's a difference between if EPA in a later year says we looked at the issue again. We actually took a serious substantive reconsideration of the issue and are reaching the same interpretation. That's not what EPA did here. Instead EPA made it clear from the proposal that it's the way the percentage standards formula adjusts for small refinery exemptions just isn't within the scope of the rulemaking not taking comments on it. And then again when it promulgated. I don't think EPA can just say we're not taking comments on the following thing and therefore it's out of bounds. There's a separate inquiry that determines whether it's out of bounds. And I guess I may not be understanding this conceptually correctly and please just please correct me if I'm wrong. But as I understand it the agency could say we're reading the regulation. Here's how we interpret the regulation. The words of the regulation mean X. And here the agency could say the words of the regulation of our regulation mean that we don't take account of retroactive exemptions. That's how we read the words. That would be one thing. That's an interpretation. But if the agency says not that but they say we don't know what the word we don't know the words compel any particular implementation. But here's how we're going to implement the regulation this year. We're going to implement it so that we're not taking account of regulatory exemptions. Those seem like different approaches and it's not the first one raises the timeliness issue. The second one it doesn't seem like it does. And your honor I think the first one is the case and I would point the court to the response to comments document at JA 1845 to 46 which is where EPA discusses this issue. EPA says that comments on this issue are beyond the scope of this rulemaking. It decided the policy many years ago and we're simply applying these long-standing regulations. But that's what you're that's what you're saying now. I don't think the agency gets to say now what we did way back when is untimely because now we're saying what we meant back then is this. What determines whether it's untimely is what you said back at the time of the instrument that triggered the 60-day clock. So that's the question and then that question means we have to look back at what you did in 2011 or in a subsequent year to see whether those instruments triggered the 60-day clock right? And I think it's useful to look at for example the 2018 rule where EPA does actually ask for comments on this. Substantively reconsiders its approach and decides it's going to keep the prior interpretation that it made 2011 through 2017. 2019 though is different where EPA doesn't reopen. 2020 again EPA decides in a supplemental notice of proposed rulemaking it's going to reconsider this issue and it takes a different approach. Yes one last question then I'll and then I'll stop. I'm sorry for occupying all the time on this but for example in 2019 and this is a JA 45 it's a 63 740 of the rule. What EPA says is we are maintaining our approach that any exemptions for 2019 that are granted after the final rules released will not be reflected in the percentage standards. That's saying you're maintaining an approach. It's not saying that there's an interpretation that of the regulation that compels that understanding. It's just an approach and if EPA said every year for example if EPA said in its rule we could choose to continue this approach or we could choose not to. This year we're choosing to continue this approach. Well then it doesn't seem to me that that means that the challenge has to be taken in that year if it then continues the approach the subsequent year. That triggers it anew. Well I see what your honor is saying and I actually disagree with that legal premise. Okay I would point the court I think that you know the EPA did establish an interpretation before but even if let's say it's just an approach they're Institute case this is cited in our brief at page 40 that's a situation where EPA established an approach in a prior rule and then it would again maintain that same approach in a later rule. The court said that it was untimely to challenge that methodology that was not challenged previously when EPA first applied it in an earlier rule. And I'll see I want to make sure I'm not Let me just ask one last question this way then. Suppose EPA specifically says when it's adopting an approach we could choose to adopt this approach or we could choose a different approach. We're choosing to adopt this approach and that's the same one that we adopted last year. Do you think that that triggers the 60-day clock anew or do you think no it's still just an approach that was cemented at time zero and so had to be challenged before? The latter. I think that if EPA says there are multiple permissible things we can do we are going to choose to interpret it with this one of the permissible approaches. EPA can then rely on that in subsequent years without reopening the issue. Can I ask is there and the chief judge is hypothetical is there any language in any of the rules suggesting that the agency is saying we could do this or we No and I don't think that's the case. I think it's instead the agency is doing what we normally permit under our they interpret their statute their regulation question is whether it's a reasonable not necessarily compelled then that's their interpretation of the regulation and if there's a jurisdictional bar to challenging it has to be challenged at that point. Isn't that your argument? Yes and what I'm saying is even if it were the case that EPA had used language of that there being maybe possible approaches and I picked one even in that situation we would consider a challenge to that interpretation of later years to be on time. Well we for example with respect to Chevron we require the agency to say we understand we have discretion here if you want Chevron step two deference you have to say we agree we have discretion here we're not So an agency following this court's general doctrine would almost always unless they actually feel compelled would say we have discretion this is our discretionary decision this is our view of a statute or under our and Kaiser this is our view of the regulation. I think that's right your honor. So counsel do you see any difference in the circumstance of an annual determination in light of the statutory language on which the petitioners relying that it's a new determination each year and I don't know if the our Chevron general approach that Judge Garland is referring to necessarily controls in that between an interpretation the point that the chief judge is exploring with you and the decision to continue or to maintain this approach. So I think if I understand your honors question you're asking if everyone always says that when I ask I think it's clear all right I'm talking about petitioners argument that the statutory language requires an annual determination. Yes your honor and that's section 03 of the statute nothing in section 03 of the statute requires EPA to revisit this issue every year it requires EPA to calculate percentage standards each year but EPA is entitled to do the calculation each year in reliance on and without reopening its prior calculation methodology. I would point out that Mr. Len referred to the Elan case in the point of obligation which is different because there at least there's the as appropriate language in 03 there's nothing like that here that applies to EPA annually having to revisit the framework regulations under which it calculates the percentage standards. So my question about the obligation to make an annual interpretation also asks you whether where the facts before the agency have changed such that applying its 2011 interpretation no longer is consistent with the purpose of the statute. In other words this is not a question of being accurate in in projecting and estimating but rather that what may have worked in 2011 to be consistent with the purpose of the statute no longer works to do anything that is consistent with the statute. Congress was trying to promote greater use this is working to the contrary it's promoting less use a negative use. So that's what I'm trying to get at is that if the circumstances have changed and yet Congress has placed on the agency the obligation to make an we're not in the situation that the chief judge was exploring with you and I thought you acknowledged that you weren't in the situation where the agency was saying even in 2011 that it was compelled to interpret its regulation in a particular way. And I think that if Congress had wanted to impose on EPA an obligation to revisit its approach every year it could have used language such as the as appropriate language that Congress used for the point of obligation. It could have but where it places I'm just trying to understand what the agency thinks an annual determination means is it just counting up gallons or is it looking at how its interpretation affects the ability of the agency to carry out Congress's purpose. So in Elan this court called the quote a quantitative standard-setting duty. I think it's fair to understand that as saying EPA needs to calculate the percentage standard each year but that doesn't mean it has to re-evaluate its approach to how it does that calculation when it establishes an interpretation years in advance. So I'll just press you on this a hypothetical. The interpretation in 2010 did produce increased use of renewable fuels. Maybe not as much as some would have liked but certainly the agency could with a straight face say that renewable fuels were being interpreted. Now, eight years later, the agency itself knows that no renewable fuel usage is occurring under its 2011 interpretation of its regulation which is not compelled. Has the agency no obligation to consider that in an annual interpretation? And I really think we were getting at something a little different in Elan but I won't press that point with you. And I think what I would say in response about your honor is this court recognized an American's for clean energy that the statute does not pursue its purposes of increased renewable fuel use at all costs. It's not really the only single goal of the statute. Well, do you at least agree that the Renewable Fuels Program did have a purpose of increasing the use of renewable fuels? Yes, I think I mean it is a purpose of the statute for sure but to say that because that single goal might no longer be being achieved effectively, there are other goals that the statute requires EPA to consider. So that's close to saying there are no circumstances that the agency would consider requiring it in its annual interpretation to reconsider what was maybe its preferred regulatory interpretation but not the Well, I think what your honor is positing is a situation where new facts or new circumstances more recently might compel a different approach. And in that situation what Elan says is the proper way to seek a change in the existing interpretation is to go to the agency first, submit a petition for reconsideration based on those new facts, ask the agency to take another look at its interpretation, but that doesn't have to be done and nor does it, nor should it be done within the context of the annual rule process where the statute doesn't require that in Section 03. Thank you. If I can take some time to respond to the other two set of petition arguments unless the court has any more here. Sure, why don't you take a minute to do that. So briefly on the producers united argument, they're simply challenging the wrong agency action because EPA didn't grant any exemptions here, retroactive or otherwise. EPA did not un-retire any RIMS. They're just in the wrong place and for that simple reason their petition should be denied. I'll also note that they try to reframe their challenge as one to the denial of an administrative petition. I would just say that EPA did not take action on that petition in this rule. That petition is still pending. EPA will act on that petition in a separate action at a future date. Turning to renewable electricity, EPA reasonably didn't include renewable electricity in its projection of cellulosic biofuel because no qualified volumes of renewable electricity have ever been produced and the key word there is qualified. You're not qualified to produce renewable electricity for purposes of the RFS statute until you have a facility that's registered to generate RIMS. It's not enough for there to be a pathway. That's not the end of the process and this registration requirement is more than a formality. It's the way that EPA ensures that RIMS are only generated for renewable fuel that actually meets the requirements to qualify under the statute. So the registration requirement is how EPA ensures that renewable fuel is being made from the proper renewable biomass using the proper production process that might be in the pathway that's been approved and then ensure that the renewable fuel is actually being used for transportation purposes. RFS power argues for the first time on its reply brief in a statutory interpretation point. They argue for the first time that the statute requires EPA to consider renewable fuel from unregistered facilities as part of its production estimate. They've waived this argument because they raised the statutory interpretation for the first time in its reply brief, never raised it in its opening brief or in their public comments. They can't claim to be surprised that this is EPA's approach because EPA made that clear in its final rulemaking. I would point the court to JAA 1698 to 99 which is where in the response to comments EPA made it clear it was only considering registered facilities and that's also been EPA's approach in prior years. We cite those places in the brief at page 77. Even if they hadn't waived this, petitioners are wrong in relying on API. API actually cuts against them. In API the court said that the cellulosic waiver provision is a safety valve to make sure that obligated parties aren't going to be subjected to an impossible or highly punitive situation. And if you read RFS the statute the way RFS power does, you would increase the obligations without a corresponding increase in RINs that can be used to meet those obligations. So that's certainly not the required reading of the statute, probably not a properly decided that it was only taking into account the registered facilities or facilities likely to be registered. Thank you, Mr. Hojima. We'll hear from Mr. Lann on rebuttal. We'll give you your three minutes. Your honors, if I may, Elizabeth Dawson on behalf of intervener. Oh, I'm sorry. I'm sorry. You're right. I apologize. I apologize. We have the intervener time. My apologies. Please proceed. Thank you very much. And may it please the court on behalf of American Fuel and Petrochemical Manufacturers, American Petroleum Institute, and Monroe Energy, I'm Elizabeth Dawson. In light of the court's discussion with the advocates today regarding jurisdiction and timeliness to hear biofuels petitioners arguments, we would simply encourage the court to agree with EPA on those grounds and uphold EPA's decision in this regard. However, should the court decide that it has jurisdiction to reach the merits, EPA has correctly acted in the 2019 rulemaking not to reallocate non-exempt obligated parties the volumes of renewable fuel attributable to small refineries who received the exemptions from compliance. This decision was consistent with the statute and reasonable and should be upheld on that basis. Biofuels petitioners have not shown that EPA had an obligation to reallocate, which is all that the court need reach here regarding the merits. Unless this court has any questions, I will cede the rest of my time. Thank you, Ms. Dawson. We appreciate it. I'm sorry to overlook that. Mr. Lin, now we'll go to rebuttal for you. We'll give you your three minutes. Thank you, Your Honor. I want to, I think, try to sum up the key points on the timeliness issue. We don't think this is time-barred for three reasons. I want to set them out as crisply as I can. The first is that the AFPM decision and the Elan decision recognize that a challenge to a duty that applies to the annual standard setting is a timely challenge, even if it would implicate the validity of an earlier adopted rule or policy, that it doesn't matter anymore. And the fact that Elan involved this language as appropriate doesn't distinguish the case. There is a statutory duty to ensure. Elan ultimately upheld EPA's actions because it read that language as appropriate not to require the reconsideration, but that was the merits determination. Before that was the timeliness decision, and it said it was a timely challenge. In AFPM, the court recognizes explicitly in saying that if the petitioners had challenged the standards, that that claim would have been timely. So that's number one. Number two, as Judge Rogers was pointing out, it is unreasonable for an agency to maintain interpretation or an approach in the face of experience that shows that it is failing. This proposition was recognized by this court in an earlier renewable fuel standard case called American Petroleum Institute at 476 and 7. The evidence was crystal clear that the exemptions were destroying the program. There are billions of RINs from these exemptions, and they completely undermine the market-forcing purpose that Congress had when it established the program. And third, there were other ways to account for the exemptions without changing interpretation. For example, EPA could have used a lesser cellulosic waiver, or it could have simply added additional amounts to the future standard to account for the previously granted exemptions. Its approach or method or whatever EPA wants to call it, to understanding the regulation, only accounted for what it's called modifying or revising the standards after they have been set. But that's not what we have said EPA should have done here. So we don't even think that the kind of adjustment we're talking about is in the teeth of EPA's interpretation or approach to its regulation. I have nothing further, Your Honor, but I'd be happy to answer any additional questions if there are any. Looks like we don't have any further questions. Thank you, Mr. Lin. Thank you. Mr. Williamson, we'll give you one minute for rebuttal. Thank you, Your Honor. The government argues that we waived an objection to their interpretation of the rule, but we have to respond to the record. And where is the interpretation of 7D in the record? The response to comments documents nowhere mentions qualified volume that the government argues now. It nowhere connects its position on RINs to the text of the statute. So again, we can only respond to what is in the record. This argument that the government is advancing now only appeared for the first time in the red brief. The API case, which the government did, which EPA did cite obliquely in the record, that is fundamentally different in this sense from what EPA is arguing now. API was concerned with the lack of physical fuel being produced. In that case, EPA was overestimating the amount of volume in order for policy reasons to promote renewable fuel technologies that were still in their infancy and needed to be incubated but actually weren't producing physical fuel. The electricity issue is completely different. We're producing copious volumes of electricity fuel. It's available. And a RIN is different than production. Why do we know? Because Congress used different terms. Congress used the word production in 7D. It also created the RIN credit program in Section 5. So Congress understood the distinction. But importantly, something that my brother said was that RINs look at not only the production but the use as transportation fuel. Well, that is certainly far beyond production. The RINs are reflective of the entire supply chain of fuel once it's produced, transported, used, ultimately. That is not what the word production means. And the government itself argued in the underlying ACE case, but it's referenced in the ACE decision, that these terms mean different things. In that case, EPA was arguing that the term supply was different than the word production. So if supply is different than production, then certainly RIN credits or facility registrations. The last point, and I know I'm over time, is that the question of qualified was answered in the 2014 pathway rule in the Federal Register notice, and actually prior to that in 2010, where EPA made the decision that electricity is qualified. That's different than counting the physical volumes that are available. Okay. Thank you, Mr. Williamson, and thank you to the Council on this issue. Why don't the Court take a five-minute recess before we come back to the obligated parties and the environmental issues. This Honorable Court will now take a brief recess. This Honorable Court is now again in session. Thank you. We'll proceed to the obligated parties' claims. Mr. Taranee? May it please the Courts. I'd like to focus this morning on severe economic harm and the point of obligation. For two reasons, EPA acted arbitrarily and capriciously when it refused to grant a severe economic harm waiver and abused its discretion when it declined to reconsider the point of obligation. With respect to severe economic harm, EPA relied on logically inconsistent reasoning when it denied a waiver based on a refiner's supposed ability to pass through RFS compliance costs, while at the same time granting scores of exemptions based on the economic harm that the RFS program causes to small refiners. EPA provided no explanation or justification for this inconsistent reasoning. EPA also completely ignored a new comprehensive expert report demonstrating the severe economic harm that the 2019 volume requirements would cause to East Coast refiners and to the broader East Coast economy. Those same two errors also demonstrate why EPA abused its discretion when refusing to reconsider the point of obligation, despite the new evidence bearing directly on whether it is appropriate to obligate refiners but not blenders. EPA provided no explanation whatsoever for deeming the point of obligation beyond the scope of this rulemaking. I'd like to turn first to the small refinery exemptions and their relevance to the severe economic harm inquiry. EPA has the authority under the Clean Air Act to grant a waiver of volume requirements where those requirements would cause severe economic harm to a state, a region, or to the United States. In 2019, EPA denied a severe economic harm waiver on the rationale that refiners are not harmed by the volume requirements because they are supposedly able to pass through their RFS compliance costs to their customers. That reasoning is utterly inconsistent with EPA's decision 85 times over the 2016 to 2018 time period to grant exemptions to small refiners based on a conclusion that the RFS program would cause disproportionate economic hardship to those small refiners. It's impossible on the one hand to reconcile those 85 findings of disproportionate economic hardship with EPA's conclusion here that there would be no severe economic harm to refiners or the broader region in which those refiners are located because refiners purportedly can pass through their RFS compliance costs. This tension, this inconsistency, was specifically highlighted in a comment letter by Valero that EPA stood silent and provided no explanation for how it can reconcile its reasoning with respect to pass-through with its decision 85 times to grant small refinery exemptions. This inconsistency has been identified by multiple other courts, most recently in the Fields Association versus EPA, a 2020 decision from the Tenth Circuit. The court vacated EPA's granting of small refinery exemptions specifically because EPA had failed to explain how it could grant those exemptions and how it could make a finding of disproportionate economic hardship while at the same time relying on pass-through theory in other settings. The Fourth Circuit, likewise, in the Ergon decision, a 2018 decision, vacated EPA's decision to deny a small refinery exemption because EPA had relied on pass-through theory to deny that exemption but had also informed the regulated community that RIN costs and RFS compliance obligations are directly relevant to the small refinery exemption inquiry. EPA had an obligation in this rulemaking to explain how it could reconcile those two strands of reasoning. Its failure to do so is arbitrary and capricious. EPA's failure to grapple with the recent surge in small refinery exemptions also underscores why it was an abuse of discretion for EPA to refuse to reconsider the point of obligation as part of its 2019 rulemaking. This court made clear in the Alon case that EPA has an annual obligation to determine whether or not it is appropriate to consider the point of obligation as part of the annual rulemaking. Here, commenters came forward with new evidence bearing directly on the propriety of EPA's prior decision to obligate refiners but not blenders and urged EPA to include the point of obligation within the scope of the 2019 rulemaking. That new evidence included the dramatic increase in the number of small refinery exemptions, 85 as I mentioned between 2016 and 2018, a significant increase over the 23 that were granted between 2013 and 2015. The evidence also included the bankruptcy of Philadelphia Energy Solutions, the largest refinery on the East Coast in 2018, which specifically identified written compliance costs as the quote primary driver for its decision to file for bankruptcy. The new evidence also included the expert report from Dr. Craig Perron, submitted by Monroe Energy, which documented the economic harm that would be caused by the 2019 volume requirements. In the face of all of that new evidence, EPA simply declared in the most conclusive way imaginable that the point of obligation is beyond the scope of this rulemaking. That was the entirety of EPA's reasoning with respect to the point of obligation. That is an abuse of discretion under this court's decision in Elan. To be sure, EPA has discretion in this field to determine whether to include the point of obligation within its annual rulemakings. But when faced with new evidence bearing directly upon the pass-through theory that is the underpinning of its prior point of obligation determinations, EPA has an obligation to exercise that discretion, to provide a reasoned explanation for why or why not to include the point of obligation within the scope of the annual rulemaking. The simple conclusory ipsedixit that the point of obligation is beyond the scope of this rulemaking is a textbook abuse of discretion. The report from Dr. Perron was a comprehensive 30-page expert analysis from a professor of finance at the University of Houston. That expert report bears directly on the propriety of the current point of obligation and it bears directly upon whether EPA acted arbitrarily and capriciously by denying the severe economic harm waiver. There were multiple new pieces of evidence in this expert report. First, the expert report focused on the East Coast of the United States. Dr. Perron explained that Pad 1 refiners traditionally have lower refining margins and lower profitability than refiners in other areas of the United States. The report also focused specifically on the 2019 volume requirements, which are 630 million gallons higher than the prior year's volume requirements. And Dr. Perron found specifically that the 2019 volume requirements would lead to a 12.3% reduction in refining margins for East Coast refiners, that the 2019 requirements would lead to a $1.6 billion loss in profits by East Coast refiners, and that these economic losses could imperil the viability of East Coast refiners and thereby have substantial ripple effects throughout the entire regional economy. As Dr. Perron explained, for each refinery job that is lost by a refinery in southeastern Pennsylvania, there would be 18.3 interrelated jobs lost in that region and 22 jobs lost throughout the state. So if a refiner the size of Philadelphia Energy Solutions with a thousand employees shuts down, that means that there'll be 18,300 jobs lost in the southeastern Pennsylvania region and 22,000 jobs lost throughout the state with an annual labor income loss of $1.6 billion. EPA said absolutely nothing about Dr. Perron's report. It stood silent in the face of this new evidence. EPA had an obligation to explain how it could reconcile its reliance on the pass-through theory to both deny a severe economic harm waiver in this proceeding and to justify its prior reasoning with respect to the point of obligation. How it could reconcile that reasoning with Dr. Perron's findings about the dire economic consequences that would arise from the imposition of the 2019 volume requirements on East Coast refiners. EPA's failure to address this new relevant evidence was arbitrary and capricious and it was an abuse of discretion that requires a remand and vacator so that EPA can consider this new evidence and can explain the inconsistent reasoning on which it relied in denying a severe economic harm waiver. EPA on remand after a vacator from this court should grapple with that new evidence and assess in a the statute specifies whether it is appropriate in light of that evidence to include the point of obligation within this rulemaking proceeding. If the panel has no questions, I'll reserve the balance of my time for rebuttal. Make sure my colleagues don't have any questions. Thank you, Mr. Tarani. We'll give you your rebuttal time that you reserved. Mr. Carlisle, we'll hear from you on behalf of the agency. Good morning. Ben Carlisle from the Department of Justice on behalf of EPA. Petitioner's arguments on the severe economic harm waiver and point of obligation are unpersuasive. First, they try to relitigate materials and arguments that were at issue in a bond. Second, they claim a logical inconsistency with EPA's grant of small refinery exemptions. Starting with their first argument, EPA reasonably declined to invoke the EPA 1675-85. It also reasonably and specifically found that commenters provided no new creditable evidence to indicate that refiners do not or cannot recover the cost of RINs. In doing so, EPA expressly cited the point of obligation denial. The court in Elan thoroughly examined and upheld EPA's conclusion that refiners pass through the cost of RINs. It also held that EPA had no annual duty to reassess the point of obligation, subject only to review for abuse of discretion. Finally, Elan held that once EPA resolves an issue, it may defend against related criticism by simply referring to that resolution, in this case, the point of obligation denial, so long as the reasoning remains applicable. Petitioners are treating this case as if Elan did not make these holdings, as if they can resubmit the same arguments that EPA cannot simply refer to its prior analyses, and that petitioners may then re-litigate these issues. It is not enough that they dress up old arguments in new clothing as they did in the Perron study. This would be treating the issues as if they are addressed on a blank slate every year, which they are not. The two CRA studies are clear examples of the petitioner's approach here. The point of obligation denial addressed the arguments raised in these studies, yet petitioners simply resubmit them. The Perron analysis is similarly based on rehashing arguments that were squarely addressed and rejected in the point of obligation denial. This includes Perron's arguments as to the Pad 1 region. It includes Perron's claim that refiners do not pass through the costs of RINs. Here, he simply relies on the CRA studies. It includes his reliance on refinery closures, which EPA already found were not due to the renewable fuel standards in the point of obligation denial. It includes his supply and demand analysis, which is how he reaches the 12.3% reduction that my colleague alluded to. His core assumption here is that RIN prices affect the price of transportation fuel, raising the supply curve. The point of obligation denial already specifically came to a contrary conclusion, which Alon upheld at 651. RINs are a form of cross-subsidy. They reduce the prices for biofuels and increase the price for petroleum products. This is found in the record at JA 169 to 70. From the perspective of the consumer of transportation fuels, these effects largely cancel each other out, so the supply and demand curves are not affected as Perron assumes. None of this is post hoc analysis. Rather, petitioners are recycling arguments that were already addressed in the point of obligation denial. EPA permissively referred to that denial and correctly found that no new credible evidence had been presented. Nor is PES's bankruptcy or its subsequent settlement with EPA evidence that it could not pass through its costs, as our brief explained. And it's worth pausing here to think about how the settlement benefited PES, because the same point is also relevant to petitioners' arguments on small refinery exemptions. Under this settlement, PES can still sell its products at a market price that includes the cost of RIN acquisition, but it will not actually have to acquire the full amount of RINs it would otherwise, thereby raising its profits. To illustrate this point, imagine that a gallon of milk costs $3, and a state then imposes a $1 per gallon tax on all stores, which they then pass through to their customers. If the state, that would raise the market price to $4 per gallon. If the state then raised this tax for a single store, that store can continue to sell at the prevailing $4 per gallon market price, and in doing so, it can take a higher profit because they do not have to pay the tax. This is important because it illustrates that the benefits to PES of its bankruptcy settlement is notwithstanding PES's ability to pass through its RIN costs. Turning to petitioners' arguments on the alleged logical inconsistency between EPA's grant of small refinery exemptions and its decisions not to invoke the severe economic harm waiver, and its conclusions on RIN cost pass-through, again, petitioners' arguments are unpersuasive. First, the court should bear in mind that EPA's conclusions on RIN cost pass-through, as Alon explained in detail, are empirical, based on an extensive analysis of actual data. Again, Alon found these conclusions well-reasoned. Particularly in light of this empirical support, there are good reasons, at least three of them, to reject petitioners' arguments of a purported logical inconsistency. First, the benefit of receiving a small refinery exemption is irrespective of a small refinery's ability to pass through its RIN costs. Petitioners go to but the foundation of their argument is not solid. Here, the same economic point that I just discussed with regard to Philadelphia Energy Solution applies to the exemptions. Again, Congress specifically authorized these exemptions by statute. Second, these exemptions do not show severe economic harm or that the hardship to small refineries is due to an inability to pass costs. EPA grants these exemptions based on disproportionate economic hardship to a particular refinery. It specifically addressed in the record the claim that these exemptions suggest severe economic harm. It explained that these are decided on a different standard than the severe economic harm waiver. The fact that there may be some hardship to some specific small refineries does not necessarily show severe economic harm to a nation, state, or region. Excuse me, the United States, a state, or a region. It explained these conclusions at JA 1680-81. Again, what we are addressing here is a subset of small refineries, which is itself a subset of the refinery industry. Petitioners make no showing that this rises to the level of severe economic harm as provided in the statute. And with this particularized focus, EPA can consider factors that are not dependent on RIN cost pass-through and factors specific to particular small refineries. For example, refiners pass through their RIN acquisition costs in the prices of their product. But RIN compliance, demonstration of compliance with the Renewable Fuels Program is annual. A small refinery may, therefore, incur all of its RIN costs at the end of the compliance period after it has already passed through those costs. If at that time they have low liquidity, credit problems, or cash flow problems, they may struggle to, in fact, acquire those RIN costs. EPA thus can consider factors such as the short-term hardship associated with RIN acquisition. This harm is irrespective of those refineries' ability to pass through their costs. In fact, petitioners do not show any situation in which EPA granted a small refinery exemption because it found that the refinery could not pass through its costs. To the contrary, it reaffirmed in the 2019 rule at 63742 that small refiners are, in fact, able to pass through RIN costs. Third, the Tenth Circuit decision and Renewable Fuels Association does not support petitioners' arguments. It actually undermines them. The Renewable Fuels Association decision did not find that EPA's grant of small refinery exemptions was inconsistent with its pass-through conclusion. Rather, it held that EPA failed to adequately consider RIN cost pass-through on the individual circumstances of the small refinery petitions. This is RFA at 1256-57. Ergon is similar, as we pointed out in our brief. It held that EPA erred in relying on generic pass-through analysis when it was examining the specific small refinery exemptions for particular refiners that were before it. Moreover, and this goes to the third reason that petitioners' arguments fail, EPA acknowledged in RFA that the factors it evaluated leading it to grant small refinery exemptions were not solely due to the Renewable Fuel Standards. It has never argued that the Renewable Fuel Standards must be the sole cause of the disproportionate hardship that leads to granting a small refinery exemption. And, in fact, RFA held that EPA's small economic hardship caused by RFS compliance. This is at pages 1253-54. This undermines any claim of inconsistency here because it undermines the causal connection the petitioners are relying on. Your Honor, if the Court doesn't have any further questions on these issues or any of the other issues in Petitioner's Brief, we would ask that the petitions be denied. Thank you, Mr. Carlisle. It doesn't appear we have questions. Thank you for your argument. Mr. Tehrani, if I looked at the timer correctly, I believe you had three minutes and 11 seconds remaining. We'll get as close to that as we can. Three minutes and 20. I'm corrected. Thank you very much. The fundamental problem with EPA's defense of its denial of the severe economic harm waiver and its refusal to reconsider the point of obligation in this Court is that almost none of the reasoning in its brief and that we heard today is contained within the four corners of its rule or within its response to comment. This Court must evaluate EPA's reasoning based on the four corners of its rule and in its response to comment, not based on post hoc rationalizations in this Court. There is nothing in the EPA's rule or its response to comments that addresses the serious logical inconsistency between EPA's pass-through reasoning on the one hand and its decision to grant 85 small refinery exemptions between 2016 and 2018 on the other. Each of those exemptions requires a finding of disproportionate economic hardship to the refinery applicants. EPA never explained when it relied on the pass-through theory here to deny a severe economic harm waiver. How pass-through could be the basis for denying the waiver on the one hand, but on the other, EPA could repeatedly find that RIN costs and the RFS compliance program are causing disproportionate economic hardship to these scores of small refinery applicants. The failure to address that issue and to reconcile that logical tension within the four corners of its decision cannot be cured by post hoc rationalizations in this Court. The same holds true with respect to EPA's lack of reasoning regarding the point of obligation. The totality of EPA's discussion of that issue is at JA 1850, and it reads as follows. Changes to the point of obligation for the RFS program are all beyond the scope of this rulemaking as EPA did not propose any changes to the overall structure of the RFS program or otherwise seek comment on these issues. These topics are not further addressed in this document. That is all and that is a textbook abuse of discretion under this Court's decision in Elan which makes clear that EPA has an annual obligation to determine whether it is appropriate to consider the point of obligation as part of the rulemaking. In light of the new evidence in this record that was not before the Court in Elan, that was not before the EPA when it issued its denial of the point of obligation petitions. EPA had an obligation to explain why that new evidence, the surge in new small refinery exemptions, the PES bankruptcy, the Puran report, why that did not compel it to consider the point of obligation as part of this rulemaking. Its failure to do so was an abuse of discretion. Thank you. Thank you, Mr. Tehrani, Mr. Karloff. We'll proceed now to the claims by environmental groups. Ms. Atfill. Good morning and may it please the Court. I'm Carrie Atfill on behalf of environmental petitioners. I'd like to reserve two minutes of my time for rebuttal. Your Honors, we're here today because in setting the volumes for the Renewable Fuel Standard Program for 2019, EPA violated the law by ignoring the very real, severe, and documented environmental harm caused by the rule. This includes the unlawful conversion of pristine grassland to grow crops for renewable biomass, causing devastation to endangered and threatened species, their critical habitats, and the environment more broadly. In doing so, EPA violated the Endangered Species Act, the Administrative Procedure Act, and the Clean Air Act. Though production of biomass to satisfy its requirements. Corn, soy, and other crops have to be grown somewhere to satisfy this mandate. And the record directly links the production of renewable biomass for the RFS program to the loss of biodiversity, soil erosion, water pollution, and harm to species. EPA turned a blind eye to all of this when setting a 15 billion gallon mandate for 2019, rendering the rule unlawful. I will first turn to our Endangered Species Act challenge and explain how in light of the record before EPA linking the production of renewable biomass to environmental degradation, it is simply implausible to find that the 2019 rule 15 billion gallon mandate will have no effect whatsoever on threatened and endangered species or their habitat. Next, I will explain how the same evidence shows that the EPA is no effective termination and the rule that depends on it are arbitrary and capricious and in violation of the Administrative Procedure Act. I will then explain that by failing to acknowledge the very real and severe environmental harm stemming from the RFS volumes for 2019, EPA abused its discretion when deciding not to issue an environmental harm waiver under the Clean Air Act. And finally, I will explain how the 2019 rules use of an aggregate compliance approach to determine whether land can be used to grow renewable biomass or the RFS program violates the Clean Air Act. Can you just, when you gave us our roadmap, your first two points were no effect points. What's the difference between the two, just so I have an idea of where you're going? Well, one was that they failed to consult, the failure to consult violated the ESA. The other focus is on the no effect determination. They rely on the same flaws in the no effect determination, your honor. The 21st of the Endangered Species Act claim, under the ESA, Congress intended to give endangered species priority over primary missions of federal agencies, imposing substantive and procedural requirements on federal agencies to protect threatened and endangered fish, wildlife, plants, and their habitat. Towards that end, the ESA requires an agency to consult with Fish and National Marine Fisheries Service before taking any action if the proposed action may affect species or critical habitat. The may affect threshold for triggering consultation is low. It essentially means more than a zero chance of having an effect. If the action may affect, consultation is required. If the action may affect but is not likely to adversely affect, this still requires the concurrence of the services. Only if the agency determines that proposed action will have no effect at all, can it do away with the consultation requirement and issue a no effect determination explaining the findings. Here, there's no question that the 2019 rules 15 billion gallon mandate may affect threatened and endangered species and critical habitat. This mandate has to be satisfied by renewable biomass grown somewhere, either on newly converted land or land already in cultivation. And the record leaves no doubt that some of this river basin, where fertilizer and pesticides used required to grow corn will lead to runoff, which contributes to the dead zone in the Gulf of Mexico, Harmon Gulf Sturgeon, which is a federally listed species. And the record also shows that some of this corn will likely come from places like Kansas, where land conversion and intensification harms the habitat of the whooping crane, another federally listed species. The record includes this evidence, as well as additional evidence that collectively shows that the proposed volumes may have some amount of effects that is more than absolutely nothing. And this is sufficient to trigger the consultation requirements under the ESA. EPA's failure to consult and its no effect determination supporting it, render the rule unlawful. Despite record evidence linking detailed environmental harms to the renewable fuel volumes, EPA irrationally tries to pretend that the 2019 volumes will have no effect on the production of renewable biomass, despite the fact that this is exactly what the rule is designed to do. Indeed, the very premise of the RFS program was to increase the production of renewable fuels. As this court has consistently recognized, quote, by requiring upstream market participants to introduce increasing volumes of renewable fuels into the transportation fuel supply, Congress intended the renewable fuel program to be a market forcing policy that would demand pressure to increase consumption of renewable fuel. And that's from AFPM at 568. The program does what Congress intended it to do. Indeed, the other petitioners are here today challenging the rule precisely because of the effects they allege the volumes will have on market demand for renewable biomass. EPA's argument is untenable. Rather, by setting a mandate of 15 billion gallons of renewable fuel for 2019, EPA is incentivizing the production of renewable biomass in the form of corn and soybeans. And study after study, including EPA's own second triennial report for the Renewable Fuel Standard Program, show that the production of renewable biomass has had devastating effects on threatened and endangered species and the environment. The causal chain is direct and unbroken. Renewable fuel volumes lead to the production of renewable biomass, and this destroys habitat and harms threatened and in AFPM. And based on strikingly similar evidence, determined that the EPA's own triennial report shows that land has been converted to grow crops to make biofuel. And the court found that the triennial report and a declaration by Dr. Tyler Lark show that, quote, this increase in including critically the particular habitats of the whooping crane and the Gulf sturgeon, end quote. Those are two federally listed species. And the court found that these reports describe the effects of the annual standards promulgated over the past decade, and that the 2018 rule is simply the next iteration of those standards, and that these reports certainly serve as evidence of the likely harms of the 2018 rule. And all of that's from AFPM at 591 to 595. The same holds true for the 2019 rule. There are a number of flaws in EPA's determination. First, EPA applies the wrong standard. The question is not whether the proposed action is reasonably certain to affect species or habitat, but rather whether the proposed action may affect species or habitat. And the answer to that question here is a resounding yes. The reasonably certain standard applies to whether an indirect effect will occur. And here it is reasonably certain that some corn will be grown to satisfy the 15 billion gallon mandate. And this clearly may affect species. For example, corn cultivation in the Mississippi River Basin leads to increased fertilizer and pesticide use, which leads to runoff contributing to the dead bone in the Gulf of Mexico and harming species such as Gulf sturgeon. EPA's attempt to import this higher burden into the initial threshold question is improper, and EPA can't escape the fact that the threshold for triggering consultation is low. It requires more than a zero chance of having an effect, which clearly is the case here. EPA also argues that corn acres is down, pointing in its brief to evidence that's not referred to or relied on in the no effect determination. EPA cannot now rely on this data to support otherwise unreasonable determination. And in any event, planted acreage is not the issue. Instead, the issue is whether the mandate will lead to the production of renewable biomass, which based on the evidence in the record, it is certainly reasonable to do, reasonably certain to do. Whether through land conversion or through intensification on already cultivated land, 15 billion gallon mandate is reasonably certain to incentivize renewable biomass production, as the rule was designed to do. And as the record shows, and as this court concluded in AFPM, and as EPA itself concluded in its own triennial report, this likely harms species and their habitat. EPA wholly ignored this in its decision not to consult. Because the volumes unquestionably meet the may affect standard, EPA's decision not to consult violated the Endangered Species Act. For these same reasons, by ignoring the same record evidence, EPA's determination and the rule that relies on it also violate the Administrative Procedure Act. EPA acted in an arbitrary and capricious manner by relying on a no effect determination that is contrary to the evidence, has no rational connection to the facts in the record, and also applies the wrong standard. An agency action is arbitrary and capricious. Excuse me. For the agency offering. Excuse me. I'm sorry, Your Honor. Could you, would you mind moving on to the severe environmental harm waiver issue? Sure, Your Honor. Under the Clean Air Act, EPA can lower the RFS volume requirement where it determines that implementation of the requirement will cause severe environmental harm. Given the documented evidence, some of which I just described, and also that's included in the record, that show that severe environmental harm caused by the Renewable Fuel Program, and that the 2019 rule is simply the next iteration of that program, and that will continue these harms. Harms including land conversion, causing environmental degradation and harm to species and habitat. EPA's decision not to issue a severe environmental harm waiver was arbitrary and capricious and an abuse of discretion. We believe EPA didn't engage in any analysis here. Had it consulted as it was required to do under the ESA, it could have found severe environmental harm. Instead, it ignored record evidence, pretended the rule doesn't do exactly what it is intended to do, which is to incentivize the production of renewable biomass. And its decision not to issue a waiver without addressing the facts that show the volumes destroy habitat and lead to severe environmental harm was an abuse of discretion. Turning to the challenge to the aggregate compliance approach, EPA... Before you go to that, before you go to aggregate compliance, can I just ask you, based on the, if we take your no effect argument and the related argument with respect to the waiver, and let's just suppose for purposes of argument, I'm not saying we will, but let's just suppose for purposes of argument that we find those meritorious. The relief you're asking, as I understood it from your brief, is for remand. Correct, your honor. We would ask for a remand with instructions for the agency to consult and for it to reconsider issuance of the waiver in light of the evidence that's actually in the record to consider all of the evidence of environmental harm. Okay, so no issue, a vacator comes up with your request, it's a remand. That's correct, your honor. Okay, thanks. So I recognize that I'm in my rebuttal time, but can I take a few minutes to talk about aggregate compliance? It's up to you, you can take this time if the time you have left to do that if you'd like. Just quickly turning to the aggregate compliance approach, EPA ignores the merits of environmental petitioner's claims and focuses exclusively on the issue of timeliness. We believe that the issue is both timely and valid. The Clean Air Act clearly defines crop-based renewable biomass as planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007 that is either actively managed or fallow and non-forested. The aggregate compliance scheme permits the conversion of land that was neither cleared nor cultivated prior to December 2007 as long as the amount of land in use of cropland across the country at any given time remains below a certain threshold. But this ignores the fact that land comes out of cultivation for a number of reasons including, for example, urbanization and that the aggregate amount may remain below the threshold level even as millions of acres of grassland are being converted for use as renewable biomass for the RFS program in violation of the Clean Air Act. In terms of timeliness, the EPA's triennial report and its use in the 2019 rulemaking constructively reopen the question of the lawfulness of EPA's use of the aggregate compliance approach. The statutorily required report, which was included for the first time in an RFS volume setting rulemaking, shows that millions of acres of previously uncultivated land have been converted to grow renewable biomass for the RFS program despite the Clean Air Act prohibition on the use of this land for this purpose. As Judge Rogers pointed out earlier, here we have a situation where the facts before the agency have changed so that applying this approach is no longer valid. So the triennial report reopens the question of the lawfulness by providing new facts and revealing changed circumstances, which includes indisputable evidence for the first time in an RFS rulemaking that the aggregate compliance provision is resulting in illegal conversion. And the evidence gained the aggregate compliance scheme a new significance in two ways. By demonstrating that the impact it was having was not consistent with EPA's original projection that new lands would not be converted to grow renewable biomass. And second, by demonstrating that despite the evidence that unlawful conversion was occurring under this approach, that EPA would still continue to follow this approach. So this new information changed the stakes of judicial review and thus constructively reopened the challenge, which would have been too speculative to bring back in 2010. So if this doesn't reopen the issue, then EPA can continue to allow for the illegal conversion of pristine grassland as renewable biomass, which violates both the text and the purpose of the Clean Air Act. Okay, thank you. We heard counsel for EPA argue that the way to address this is to file a petition. I'm sorry, Judge Rogers, I'm having trouble hearing you. Previously, counsel for EPA said the proper way to raise this is through a petition to the agency to change its approach. Any comments? Sure, Your Honor. We believe that that is a proper way to if the challenge were brought for the entire Renewable Fuel Standard Program. Our challenge right here is for the 2019 rulemaking, and so I don't think that they're mutually exclusive. I think a petition for review can ask to amend the use of the aggregate compliance scheme for all of the Renewable Fuel Standard Program. I think our position is for this case, that this challenge is appropriate and timely because EPA is continuing to use this approach despite evidence in this rulemaking that shows that this approach violates the Clean Air Act. And so I think that this challenge is timely, but that doesn't mean that you can't also have a petition to amend for the overall Renewable Fuel Standard Program. Thank you. Thank you, Ms. Abtfeld. We'll give you a little bit of time for rebuttal. Mr. Idle, we'll hear from you on behalf of the agency. I have placed the court, Mike Idle, with Department of Justice for Respondent Environmental Protection Agency. Your Honors, in the litigation over the 2018 rule, this court held that EPA must expressly address its obligations under the Endangered Issue head on in the 2019 rulemaking. It looked at the facts and the circumstances and the evidence surrounding the 2019 rule, and it determined that this rule is not driving corn, soybean, or other feedstock production for biofuels, and therefore is not the causal mechanism that is causing impacts to endangered species or their critical habitat. And that supported by the evidence, and it highlights a key disconnect that runs throughout this entire case, and that is that petitioners rely on the same evidence they relied on in the past litigation. They rely on the Lark Declaration and EPA's Triennial Report, both of which are retrospective analysis of past biofuels from 2006 and before. They do not address- does speak to the future as well. That evidence is primarily a retrospective analysis of conditions before- Maybe primarily, but not exclusively. Is that correct? There is some predictions within the 2018 Triennial Report that look to the future, but no, that report was issued in June 2018. It did not look at facts and circumstances specific to the 2019 Renewable Fuel Rule. And what changed? What changed is we have intervening evidence since 2016, and- And that evidence is? So, EPA addressed that in JA1635. And so, if we start with corn, and that's about when they reference a 15 billion gallon renewable fuel mandate, that is the corn ethanol mandate. And what EPA looked at is, they looked at if you were- If you take away our 2019 rule, if it is gone, would that at all change production of corn ethanol in the United States? Would it change crop production practices in the United States? And a good illustrative point of that is EPA's analysis from 1938 to 39, where EPA engages in that type of analysis. If you take this rule away, what happens? And so, looking at like corn ethanol, the market is built up to blend corn ethanol into nearly every gallon of gasoline. It's what is referred to as E10 gasoline. It is an additive. As EPA points out, the data shows that corn ethanol is cheaper than regular gasoline. It is economical for refiners to blend that into every gallon of gasoline. So, looking at the market factors, regardless of whether there's an RFS rule, the market will produce corn ethanol and blend it into a gallon of gasoline. But it doesn't mean that the corn production is not also... I'm just talking about what's in the record. Right. And this is in the record at J... No, I understand that's in the record, but again, it's not saying exclusively it's all going to be this E10 gasoline. No, it is not saying exclusively E10, but with corn production, in addition to E10, there is a robust export market for corn ethanol. And that export market is not tied to renewable fuel standard rules. And the illustrative figure is figure one on JA1640. And it shows that U.S. production of corn ethanol is exceeding consumption, and that exports of this commodity are increasing over time. And so, EPA looked at the total demand for corn ethanol exceeds the renewable fuel mandate. And so, if you take away the RFS volumes, you'll still have production for E10 additive blends. You'll still have production for exports. And so, it's not the case that simply this rule is driving production of the biofuel. And if it's not driving production of biofuel, it's also not driving production of the crop. So, what the Triennial report said was that evidence from observations of land use change, land use change suggests that some of this increase in acreage and crop use is a consequence of increased biofuel production mandates. And it's talking about corn in part there. Correct, your honor. And what that's talking about is again, that retrospective analysis. And so, we're not disputing the broader look at an RFS program that in circumstances it can have those kind of interactions. What EPA was very specifically focused on is the regulation ad issue in this case, and that's the 2019 rule. And it was looking at those market, agricultural fuel market factors specific to the 2019 rule. And it's actually illustrative if we talk about like soy production. Vegetable oil from soybeans is used to produce advanced biofuel. And this is a different circumstance than corn because the RFS rule is driving production of renewable biofuels made from virgin vegetable oils, like soybean or canola oil. And so, EPA again looked at and scrutinized the evidence on those factors. And it found even though the renewable fuel is supporting increased production of those biofuels, that it is not driving production of soybean crops in 2019. And among those factors is new evidence and new regulatory factors surrounding 2019, like a large surplus of soybeans on hand. Chinese tariffs that are reducing exports of these commodities. So, where are you getting your standard of driving force? All right. So, we're looking at principles of causation. And so, when EPA is looking at it, what kind of effects is this rule going to have? And we discuss it in terms of both standing and then when we get into the merits on whether this is a may affect. But they all revolve around principles of causation. And is this rule driving crop protection or agricultural practices in the US? And where do you get that in this context? The standard, your honor? Where does it say that in order to meet the standard here, that the petitioners have to show that the 2019 rule is the driving force? Sure. You're guessing it has to show exclusivity, and I don't see that anywhere. So, the exclusivity point comes from what they are challenging in this case. Under the Clean Air Act, all they are challenging is the 2019 regulation. So, for purposes of standing, they need to show that the 2019 regulation is a causal factor of some concrete and particularized but do they have to show it is the driving force? When you say that, it's as though everything else is to be excluded. So, that even if the 2019 rule is a partial cause where they have shown through these expert studies, there is a causal link. Why isn't that enough? So, based on the evidence in J1635, we do not believe there is that causal link to begin with. But even if you have an expert, well, your own triennial report says there is. Again, the triennial report is a little different beast because it was looking at the kind of past program, past biofuel use. EPA, as this court said in the 2018 opinion, EPA took that very directed analysis at the 2019 rule, and it looked at those specific economic and market factors applicable to the 2019 rule. And that is what the prior court asked, and that is the expert analysis that we are relying on because, importantly, these are points that EPA does have expertise in analyzing and reviewing when it's implementing the Renewable Fuel Standard Program. I understand that we defer to agency expertise, but your own record of experts is contrary to what you're suggesting we defer to. And on that point, Your Honor, I point the court to JA1649, and that is EPA's ESA determination where it expressly addresses its triennial report and explains these are both EPA products, and it did reconcile and wrestle with what are the And so, it did not ignore its prior determination. In fact, it looked at it expressly. And I think the key driving factor here is that conditions surrounding renewable fuels or biofuels or even all RFS rules are not the same every year, that there are specific market factors that are different from year to year, and it takes that directed analysis of what is the impact of the rule. And one example of that, I'll point to it again, is soybeans with the Chinese tariffs. It created a huge surplus of soybeans in the United States. And so, EPA's looking at, look, is it reasonable to say our rule is driving production of soybeans when we have a surplus of soybeans on hand? We have more than enough products to meet whatever Renewable Fuel Standards are being applied for the 2019 rule. So, can I ask you this about GA 1649? So, I know that towards the bottom of the page, there's an effort to say that there's an acknowledgment that statements in the triennial report may appear inconsistent with our conclusions, and I get that. But just up above a little bit, the agency said the report did not purport to establish a causal connection between the RFS annual rules and the land use changes. And then what the report said is, it's likely that the impacts associated with land use changes are, at least in part, due to increased biofuel production and use associated with the RFS. Those statements don't seem reconcilable to me. So, a large part of the statements that EPA was making there is the triennial report was looking at biofuels generally, like exports of corn, ethanol, and not all biofuel issues are wrapped up in annual RFS rules. RFS deals with only use of biofuels in the United States. So, the issues surrounding biofuels generally is much broader than annual Renewable Fuel Rules. So, that is part of what EPA was driving at in that statement. The other more salient point for our purposes is that the triennial report certainly was not at the individual effects of individual RFS rules like it did in this case. And so, your honor, even if we assume that there is some link, even despite the evidence, if we assume there's some link between the RFS and environmental harm, EPA still addressed those factors and found that there was not enough of a link or enough evidence to show that even if there is some crop production in the United States, that it is actually having an impact on ESA listed species or critical habitat. And at least for the purposes of standing, I'd point the court to the Supreme Court's decision in Lujan v. Defenders of Wildlife, where the court addressed a similar issue of you had federal funding on a foreign project and that federal funding was less than 10 percent of the foreign project. Is this 504 U.S. or is this another Lujan? Sorry, 504 U.S., correct? Yeah. And the court there found even if you remove that 10 percent of foreign funding, there was a lack of evidence showing that there was that ability to redress the injuries they were complaining about. And there's a similar circumstance here as we point to page 91 and 92 of our brief, that even if you assume there's some connection, even plaintiff's evidence shows that that would be a very small impact. And they certainly don't provide any evidence that if you remove the RFS or you remove that impact, that there's going to be any perceptible change to their members, to the injuries their members complain about, or to endangered species or their critical habitat. And so, Your Honor, overall, just direct the court again to JA1635, where EPA does the directed, targeted analysis of the facts and evidence surrounding the 2019 rule. They considered the relevant factors, made a reasoned, rational determination, and that determination is properly entitled to deference and should be upheld. So if there's any questions the court has on aggregate compliance or any of the other factors, I'm happy to address them. Well, I think so. We appreciate your argument, Mr. Idle. Thank you. Thank you, Your Honor. Ms. Apfel, we'll give you the two minutes you wanted to reserve for rebuttal. Thank you, Your Honor. Just to begin with, once again, even in the argument, EPA is still applying the wrong standard. The standard isn't whether the RFS is actually having an effect on threatened and endangered species or habitat, but whether it may affect. Ms. Apfel, could you address the new evidence since the triennial report that EPA says they're new evidence is focused just on 2019? Sure, Your Honor. First, I don't believe that the triennial report is retrospective. To Judge Rogers' point, it clearly says that, and this is at JA1470, that the available data in the triennial report suggests that the current trends using cornstarch and soybeans as primary biofuel feedstocks with associated environmental and resource conservation impacts will continue in the near term. It also states on JA1530 that EPA can state that biofuels are responsible for a percentage of domestic land use for and the environmental effects from corn and soybean production, including newly converted land. It also states that the environmental impacts, including impacts to air quality, soil quality, water quality, and the associated land use change, are at least in part due to increased biofuel production and use associated with the RFS. So it's not just biofuel generally, but to RFS specifically. What about their arguments about the market producing the same amount of corn ethanol? Your Honor, two points on that. First, they made that argument in 2018 and the court flatly rejected that argument. Second, it just seems completely implausible. Rejected in AFPM or? In AFPM, yes, Your Honor. And the second point is that it's just simply implausible to find that a 15 billion gallon mandate will have no effect whatsoever on the production of renewable biomass. To Judge Rogers' point, it doesn't have to be the only driver, but it is certainly a driver of production of renewable biomass. And then all of the evidence in the record links that production to all of the severe environmental harms and harm to species and their habitat. So while there might be this additional evidence, that doesn't refute all of the evidence that's already in the record that links the RFS program and the volume to the production of renewable biomass. As I understood counsel's argument, it was in part, suppose everything you say is correct. Nevertheless, EPA looked at 2019 and I'm going beyond what counsel argued. So hypothetically, suppose there was a record that showed that the 2019 rule was not going to have any effect on production, no effect whatsoever, because the market was flooded. He gave the example of soybean, but let's suppose corn too, just for sake of the hypothetical. Then what would your response be? Still the triennial report, sort of the carryover effect is enough. Or does the 2019 rule itself have to have, and I think this is your argument, some effect. So I just wanted to be clear about that. Yes, your honor. I think that if there were evidence that truly showed that there was no effect at all on renewable biomass production, it might be a different case than what we're arguing here. But I don't believe the record reflects that. I understand you're giving a hypothetical. And I think that... No, and I understand and counsel's arguments never referred to the correct standard, but I just wanted to be clear. I do think that you need to look at it for each year. I don't think that you can look at it in isolation. However, I think that there is a mountain of evidence that directly links these volumes to renewable biomass production, which leads to land conversion, which leads to environmental harm, which leads to harm to species and the environment. And it would really take something to overcome that mountain of evidence, really unique to 2019, which is not in the record here. I don't think they can overcome that mountain of evidence for 2019 that shows that a 15 billion gallon mandate has to rely on corn and soy produced somewhere. And then once you reach that conclusion that you need soy and corn, soybeans and corn produced somewhere to satisfy the mandate, then you go back to the direct link to all of the environmental harms and harms to species and habitat that flow from that. Okay. Thank you, Ms. Apfel, unless my colleagues have other questions. Thank you for your argument. Thank you to all counsel for your arguments this morning. We'll take all the issues in this case under submission.
judges: Srinivasan, Rogers, Garland